## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**MARIETTA BOYD,**

        **Plaintiff,**

    **v.**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

**Case No. 2:13-cv-789**

**Judge Gregory L. Frost**

**Magistrate Judge Elizabeth P. Deavers**

## REPORT AND RECOMMENDATION

Plaintiff, Marietta Boyd, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's Memorandum in Opposition (ECF No. 20), Plaintiff's Reply (ECF No. 21), and the administrative record (ECF No. 12). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.      BACKGROUND

Plaintiff filed her applications for benefits on May 12, 2009, alleging that she has been disabled since December 23, 2008, at age 40. (R. at 152-55, 156-59.) Plaintiff alleges disability from back pain, diabetes, high blood pressure, and heart problems. (R. at 181.) On Appeal, Plaintiff also alleged disability due to blurred vision and anxiety. (R. at 219.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge.

1

Administrative Law Judge Amelia G. Lombardo ("ALJ") held a hearing on August 11, 2011, at which Plaintiff, represented by counsel, appeared and testified. (R. at 37-54.) Vocational Expert Brian Womer ("VE") also appeared and testified at the hearing. (R. at 54-57.) On November 1, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 7-26.) On June 11, 2013, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-5.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she lives in a first floor apartment with her fifteen-year-old daughter. (R. at 37.) She stated that she has a ninth-grade education. (*Id.*) Plaintiff testified that she previously worked as a parts assembler and a machine operator for a General Motors supplier, but that job ended when the General Motors plant closed. She explained that she was out on sick leave for four to six months prior to the General Motors plant closure. (*Id.*)

Plaintiff testified that she drove to the hearing. (R. at 38.) She testified that it took her between 15-20 minutes to walk from the parking lot to the hearing office, which is three blocks. (R. at 39.) She explained that she took about five breaks and was "short winded" when she got to the hearing office. (R. at 52-53.) She averred that walking causes her back to hurt. (R. at 39-40.) Plaintiff stated that when she walks, she becomes short of breath and sometimes she falls. (*Id.*) Plaintiff also testified that standing or sitting for twenty minutes causes pain in her lower back. (R. at 40.) She stated that she could not lift a case of water at the grocery store. (R. at 40-41.) She also explained how she feels fatigued all the time. (R. at 53.)

2

Plaintiff testified that she took insulin for her diabetes and that the medications and injections from pain management specialist Bruce Kay M.D., were helping her pain. (R. at 40.) When asked about mental health issues, Plaintiff testified that Dr. Kay ran an anxiety test, and based on the test results, Dr. Kay referred her for mental health treatment. (R. at 41.) Plaintiff stated that at her first evaluation she told the provider that she did not think she was depressed because she was concerned about losing her daughter in a custody battle. (R. at 41-42.) At the time of her hearing, Plaintiff explained that she was seeing a psychiatrist every month. (R. at 43.) She testified that she hears things, feels paranoid, gets scared, and does not sleep. (R. at 52.) Plaintiff further indicated that she is scared to be in her own home and is tired during the day due to getting little sleep. (R. at 46.)

In terms of daily activities, Plaintiff noted that she takes care of her household, but not "like [she] used to." (R. at 43.) Plaintiff explained that chores are difficult and she largely snacks or eats microwavable meals rather than preparing food. (R. at 44.) She stated that her daughter helps her with household cleaning, including washing the dishes, laundry, and vacuuming. (R. at 45, 50-51.) Plaintiff explained that a typical day is "hard" and "just stressful." (R. at 45-46.) She noted that she usually does not leave her home and mostly watches television during the day. (*Id*.)

## B.    Vocational Expert Testimony

The VE testified at the administrative hearing. (R. at 54-57.) The VE testified regarding Plaintiff's past relevant employment as a parts assembler and a machine operator. (R. at 55.) He noted that both positions were at the semi-skilled, medium exertional level. (*Id*.)

The VE acknowledged that an individual of Plaintiff's age, education and work experience limited to unskilled work could not perform Plaintiff's past relevant employment. (*Id.*) The ALJ asked the VE what work an individual could perform if limited to a residual functional capacity to

perform light unskilled work with additional limitations of no more than occasional stooping; low stress; no heights or hazardous machinery; and only minimal contact with coworkers, supervisors and the general public. The VE testified that the individual would be able to perform the requirements of approximately 17,000 unskilled jobs in the regional economy at a light exertional level. (R. at 55.) The VE explained that Plaintiff could perform jobs such as laundry worker and housekeeper. (*Id.*) The VE stated that he believed his testimony was consistent with the *Dictionary of Occupational Titles* ("DOT"). (R. at 55-56.)

When cross-examined by Plaintiff's counsel, the VE testified that an individual who was off-task 10% of the time or absent one to two days per month would not be able to maintain the jobs he identified in his previous testimony. (R. at 56-57.) Further, the VE stated that all competitive work requires that an employee maintain a stable relationship with a supervisor. (R. at 57.) The VE also testified that lifting limitations involving five pounds of frequent lifting and six to ten pounds of occasional lifting would preclude the performance of all the light work he identified in his previous testimony. (*Id.*)

### III.   MEDICAL RECORDS

**A.   Physical Impairments**

1.   <u>Dayton Outpatient Center/G. Jeelani Mukhdomi, M.D</u>

In 2008, Plaintiff treated with pain specialists Dr. Mukhdomi. Dr. Mukhdomi prescribed Plaintiff Percocet, Robaxin and Relafen.[1] (R. at 259, 336.) A cervical spine MRI performed on June 3, 2008, revealed that Plaintiff had disc bulging at C3 through C7 with some mild ligament

---

[1]Dr. Mukhdomi's treatment records are not included in the administrative record, but notations to his treatment of Plaintiff is noted in other treatment records.

thickening but no cord compression. (R. at 542.) The radiologist noted that Plaintiff might have some slight effacement at her C4-5 and C5-6 levels. (*Id*.)

      2.    <u>Jodi VanJura, M.D.</u>

Plaintiff treated with family practice physician Dr. VanJura from at least April 1, 2008 through January 22, 2009. (R. at 257-72.) Dr. VanJura treated Plaintiff for insomnia, daytime fatigue, diabetes, and high blood pressure. (*Id*.) A chest x-ray taken on April 1, 2008 showed that Plaintiff had mild cardiomegaly (enlarged heart). (R. at 265.)

On September 29, 2008, Plaintiff requested a referral to Dr. Kay the a pain management physician, to obtain a second opinion, and to discuss alternatives to spinal surgery for addressing her longstanding neck pain and stiffness. (R. at 259.)

      3.    <u>American Health and Pain Management Center/Bruce Kay, M.D.</u>

Plaintiff began treating with Dr. Kay, on December 2, 2008.   (R. at 336-38.) She complained of neck and low back pain. (*Id*.) Plaintiff explained that she had a history of diskogenic disease of the cervical and lumbar spine. (*Id*.) On examination, Plaintiff's toe and heel walking were intact; and straight leg raising was negative with no lumbar tenderness. (*Id*.) Dr. Kay prescribed Methadone and Flector patches and he ordered spinal x-rays. (R. at 336-37.) X-rays of Plaintiff's spine, from December 15, 2008, showed spurring at her L4 and in the lower dorsal spine consistent with mild spondylosis. (R. at 351.) X-rays also revealed that Plaintiff had some mild degenerative disease at C4-5 and at C5-6. (*Id*.)

Plaintiff saw either Dr. Kay or physician assistant Paul Lopreato, when visiting Dr. Kay's office. Dr. Kay adjusted Plaintiff's medications in response to her complaints of neck and low back pain. On July 27, 2009, Dr. Kay noted that medication was controlling Plaintiff's back and leg pain symptoms. (R. at 396.) Dr. Kay referred Plaintiff for psychological counseling. (*Id*.) On September

25, 2009, at a follow-up examination, Mr. Lopreato stated that Plaintiff was "doing well" on her current medication regimen. Plaintiff reported that she was better able to perform daily activities when she took her medications. (R. at 392.)

On November 20, 2009, Dr. Kay noted that Plaintiff's complaints included neck, low back, and bilateral leg pain. (R. at 528.) Dr. Kay reported the following:

> [Plaintiff] needs to have MRIs of her cervical and lumbar spine. So we can get a diagnosis on her. Her x-rays show some cervical and lumbar diskogenic disease, but we have no other test and no way of treating this individual as she has no insurance.

(*Id*.) Dr. Kay noted that Plaintiff's lumbar spine MRI from June 2008 was normal and her x-rays of the lumbar spine showed some mild lumbar spondylosis; her hips were normal; and her cervical spine showed some mild degenerative disease. (*Id*.) Dr. Kay noted that Plaintiff "has no surgical pathology whatsoever. Although she complains of both legs hurting her, there is nothing on the MRI to give an answer for that." (*Id*.) Dr. Kay further noted that Plaintiff has high blood pressure, "psych," and diabetes, but "[f]rom a spinal standpoint, there is nothing disabling as her MRI is normal." (*Id*.) Dr. Kay reported that Plaintiff had no signs of herniated disks. (*Id*.) Dr. Kay asserted that given Plaintiff's young age, he was not willing to fill out disability paperwork. (*Id*.) He recommended exercise and a light duty rather than heavy labor job. (*Id*.)

When seen on December 23, 2009, Plaintiff rated her pain at a level of 8 on a 0-10 visual analog scale, 9 on average, and at least a 7 on a daily basis. (R. at 527.)

Dr. Kay's treatment notes throughout 2010 show Plaintiff continued to complain of persistent back and bilateral leg pain. (R. at 522-25, 630-44.)

On February 28, 2011, Mr. Lopreato found that Plaintiff had decreased lumbar range of motion on examination. (R. at 621-23.) Plaintiff told Mr. Lopreato that she had been offered

6

injections in the past. Given her diabetes, Mr. Lopreato noted Plaintiff should avoid steroids, but recommended lumbar facet injections. (*Id.*)

On April 1, 2011, Dr. Kay noted Plaintiff's main complaint was her lower back. (R. at 618.) Plaintiff stated that, "she cannot tolerate the pain" and that "she can barely drive anymore." (*Id.*) Dr. Kay noted that Plaintiff was tender in the lower lumbar spine and reported muscle spasms. (*Id.*) Dr. Kay also noted some mild limitations in Plaintiff's cervical range of motion with some pain. (*Id.*) Dr. Kay indicated that Plaintiff was neurologically intact in the lower and upper extremities, and she had no significant leg pain. (*Id.*) Dr. Kay reported that Plaintiff's lumbar spine appears normal. (*Id.*) Dr. Key ordered an MRI and physical therapy. (*Id.*)

On April 4, 2011, Plaintiff had an MRI of her lumbar spine. (R. at 574-75.) The MRI revealed facet arthritis at the lower three levels of Plaintiff's lumbar spine and occasional spondylitis changes. (*Id.*) The MRI further revealed that Plaintiff's central canal and foramina were patent at all levels. (*Id.*)

On July 27, 2011, Dr. Kay completed a medical statement on Plaintiff's behalf. (R. at 648.) Dr. Kay reported that Plaintiff's clinical signs present on examination or testing included neuro-anatomic distribution of pain, limitation of motion of the spine, and a positive straight leg raising test. (*Id.*) Dr. Kay noted that Plaintiff needed to change positions more than once every two hours, and that she has an inability to ambulate effectively, *e.g.*, inability to walk a block at a reasonable pace on rough or uneven surface, inability to walk enough to shop or bank, and inability to climb a few steps at a reasonable pace with the use of a single handrail. (*Id.*) Dr. Kay opined that Plaintiff could work two hours per day; lift up to ten pounds occasionally and five pounds frequently; sit for 30 minutes at a time; stand for 15 minutes at a time; and never bend or stoop. (*Id.*)

7

4.      Sycamore Hospital

In February 2009, Plaintiff was admitted to the hospital for observation due to complaints of chest pain and shortness of breath. (R. at 273-311.) A cardiac workup was negative, but staff at the hospital noted that Plaintiff appeared anxious and her blood sugar was elevated. (R. at 279-80.) An echocardiogram showed that Plaintiff had mild left ventricular hypertrophy with normal left ventricular systolic function and an ejection fraction of 55% to 60%. (R. at 304-06.)

5.      Ugo Nwokoro, M.D.

Plaintiff established care with internist Dr. Nwokoro on February 18, 2009. Dr. Nwokoro assessed that Plaintiff had uncontrolled diabetes, hypertension, major depressive disorder, generalized anxiety disorder, unspecified anemia, and a chronic pain syndrome. (R. at 322.) Following the appointment, Dr. Nwokoro opined that Plaintiff could lift or carry five pounds frequently and six to ten pounds occasionally; sit for 30 minutes at a time for up to three hours in an eight-hour workday; stand for 15 minutes at a time for up to two hours in an eight-hour workday; walk for 15 minutes at a time for up to two hours in an eight-hour work day; was markedly limited in her ability to bend; and was extremely limited in her ability to engage in repetitive foot movements. (R. at 313.) Dr. Nwokoro concluded that Plaintiff was "unemployable." (*Id.*)

On February 25, 2009, Dr. Nwokoro examined Plaintiff at a follow-up appointment. (R. at 416.) Plaintiff reported she was "doing ok," and was compliant with her medications. Dr. Nwokoro reviewed Plaintiff's systems and found no joint swelling. (*Id.*) Plaintiff reported on April 8, 2009, that she had a poor appetite and was "walking a lot." (R. at 418.) Plaintiff had lost 13 pounds since her last visit. Dr. Nwokoro again found that Plaintiff had no joint swelling. (R. at 418.)

8

On May 22, 2009, Dr. Nwokoro completed a questionnaire regarding Plaintiff's mental impairments. (R. at 323.) Dr. Nwokoro acknowledged that Plaintiff had informed him of her mental impairments since their first treatment appointment. (*Id.*) Dr. Nwokoro reported that he had provided counseling to Plaintiff for her depression and that he had also referred her to psychiatric treatment. (*Id.*) He concluded that Plaintiff's depressed moods sometimes lead to poor compliance. (*Id.*)

On June 3, 2009, Plaintiff blood pressure was high, and she complained to Dr. Nwokoro that her legs felt "weighty" and she had a general feeling of fatigue. (R. at 422-23.) Plaintiff reported intermittent memory loss and a "significant" weight gain of 13 pounds in the last two weeks. (*Id.*) On July 1, 2009, Plaintiff's blood pressure was still high, her blood sugars were not well controlled and Dr. Nwokoro noted that she had been under a lot of stress. (R. at 426-27.) Dr. Nwokoro assessed hypertension; diabetes type II, uncontrolled; iron deficiency anemia; unspecified polyarthropathy or polyarthritis; and major depressive affective disorder, recurrent, episode moderate degree. (*Id.*) Dr. Nwokoro noted that, "[f]urther review reveals that she is not sure she is really taking her [blood pressure] medication" and that Plaintiff "says she feels fine." (R. at 426-27.) Dr. Nwokoro told Plaintiff that she needed to be compliant with her medications. (*Id.*)

Dr. Nwokoro saw Plaintiff on August 10, 2009, for an emergency room follow-up. The day prior, Plaintiff had gone to the emergency room due to headache and elevated blood pressure. (R. at 430-31.) Plaintiff reported that she had been compliant with her medication, but got easily nauseated and vomited. Dr. Nwokoro changed her medication. (R. at 430-31.)

Plaintiff last saw Dr. Nwokoro on October 14, 2009. (R. at 434.) Plaintiff reported poor appetite, but Dr. Nwokoro noted that she cannot "exactly pinpoint a complaint." (*Id.*)

6.     Shear Family Practice/Scott Shaw, M.D.

The record shows Plaintiff treated with Dr. Shaw from December 10, 2009 until at least

May 23, 2011. (R. at 597-613.) On December 10, 2009, Dr. Shaw completed a Basic Medical

Form for Plaintiff. Dr. Shaw noted Plaintiff's history of a motor vehicle accident in 2001 with

chronic back and neck pain, hypertension since 1996, and diabetes since 2008. (R. at 614) Dr.

Shaw felt Plaintiff's health status was good and stable with treatment. (*Id.*) Dr. Shaw opined that

Plaintiff could lift or carry up to five pounds; sit for 15 minutes at a time for up to 30 minutes in an

eight-hour workday; stand for 15 minutes at a time for up to 30 minutes in an eight-hour workday;

and walk for 15 minutes at a time for up to 30 minutes in an eight-hour work day. (R. at 557-58.)

Dr. Shaw also found that Plaintiff was "extremely" limited in her ability to push, pull, bend, reach,

handle, and engage in repetitive foot movements. (*Id.*) Dr. Shaw concluded that Plaintiff is

"unemployable." (*Id.*)

Plaintiff underwent a chest x-ray on May 13, 2011, which showed old granulomatous

disease. (R. at 596.)

7.     State Agency Evaluations

On September 4, 2009, state agency physician, Gerald Klyop, M.D., reviewed the record

and assessed Plaintiff's physical functioning capacity. (R. at 381-88.) Dr. Klyop opined that

Plaintiff could lift, carry, push and pull twenty pounds occasionally and ten pounds frequently; and

stand, walk and/or sit for about six hours in a workday. (R. at 382.) Dr. Klyop also found that

Plaintiff should never climb ladders, ropes or scaffolds, but could occasionally stoop; and Plaintiff

should avoid concentrated exposure to heights, hazards, or dangerous machinery due to the level

of her sedating medication. (R. at 383, 385.) Dr. Klyop found Plaintiff's alleged functional

10

limitations and symptoms only partially credible and not totally consistent with the objective findings. (R. at 386.)

On December 24, 2009, state agency physician, William Bolz, M.D., reviewed the record upon reconsideration and affirmed Dr. Klyop's assessment. (R. at 516.)

**B.      Mental Impairments**

 1.      <u>Samaritan Behavioral Health</u>

Plaintiff began mental health treatment at Samaritan Behavioral Health on August 5, 2009. (R. 506-13.) Plaintiff scheduled an appointment because of Dr. Kay's recommendation that she receive counseling. Cynthia Gillespie, L.S.W. examined Plaintiff. At the appointment, Plaintiff did not agree that she was depressed, and explained that she was "just concerned" over her child's custody battle. (R. at 506.) Plaintiff described herself as disabled due to her physical problems. (*Id*.) Ms. Gillespie noted that Plaintiff had a mildly mistrustful demeanor, mildly slowed motor activity, somatic delusions, guarded thought content, and a depressed affect. Ms. Gillespie also noted that Plaintiff appeared anxious, angry, and irritable. (*Id*.) Ms. Gillespie found Plaintiff had full orientation and good insight. Ms. Gillespie noted that Plaintiff had no deficits in abstraction, memory, attention, or concentration. (R. at 515.) Ms. Gillespie diagnosed Plaintiff with anxiety disorder due to her general medical condition and a pain disorder. (R. at 512.) Ms. Gillespie assigned Plaintiff a Global Assessment of Functioning (GAF) score of 42.[2] (*Id*.)

---

  [2]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34 ("DSM-IV-TR"). A GAF score of 42 is indicative of "serious symptoms . . . or serious impairment in occupational, social, or school functioning." DSM-IV-TR at 32-34.

Plaintiff received counseling through February 2010, from Ms. Gillespie. (R. at 478-501.) Ms. Gillespie noted that Plaintiff reported suffering from anxiety, depression, and trouble getting out of bed sometimes. (*Id.*) Ms. Gillespie also noted that Plaintiff appeared depressed, confused, or angry, and sometimes cried during her counseling sessions. (*Id.*) On September 28, 2009, Ms. Gillespie reported that Plaintiff appeared disoriented, had had mild loose associations, and was slurring her words. (R. at 490.) Ms. Gillespie stated that it appeared as if Plaintiff was "under the influence of something." (R. at 490.)

Jamie McLean, M.D. evaluated Plaintiff on November 4, 2009. At the appointment, Plaintiff stated that she was told that, "[she] need[ed] to see a psychiatrist to get [her] disability and to be able to work at the same time." (R. at 502.) Dr. McLean found that Plaintiff was moderately depressed, with an anxious mood, and she had a constricted affect. (*Id.*) Dr. McLean otherwise reported cooperative behavior, no impairment of memory, full orientation, logical thought processes, clear speech, and no evidence of delusions or suicidal ideation. (*Id.*) When discussing treatment options, Plaintiff stated that she has Zoloft at home but was vague in whether she had started taking it or not. Dr. McLean diagnosed Plaintiff with major depressive disorder and assigned her a GAF score of 47. (R. at 504.)

Plaintiff was hospitalized in March 2010. Plaintiff reported having suicidal thoughts and seeing the deceased father of her adult son. (R. at 668-74.)

2.    Advanced Therapeutic Services

Plaintiff met with social worker, David Tieman, M.S., L.S.W., on February 7, 2011. (R. at 667.) Mr. Tieman found Plaintiff had euthymic mood, goal-directed thought processes, and improved sleep. (R. at 667.) Mr. Tieman also noted that Plaintiff showed no evidence of delusions, hallucinations, or suicidal ideation. (*Id.*) On February 14, 2011, Plaintiff reported that she had been

12

staying up all night and felt hopeless. (R. at 666.) Mr. Tieman noted that Plaintiff had rambling thought content and a flat affect. (*Id.*) On February 21, 2011, Mr. Tieman encouraged Plaintiff to continue taking her anxiety medications. (R. at 665.)

On March 17, 2011, Ramakrishna Gollamudi, M.D., evaluated Plaintiff for reported increased anxiety, depression, and stress. (R. at 660-62.) Dr. Gollamundi diagnosed Plaintiff with major depressive disorder with psychotic features and an anxiety disorder. (R. at 662.) Dr. Gollamundi assigned Plaintiff a GAF score of 51. (R. at 662.) Plaintiff continued to see Dr. Gollamudi for medication and somatic services. (R. at 649, 652, 653, 655, 656.)

In March 2011, Plaintiff also received counseling from social worker Audrey Violand, M.S.W. Ms. Violand generally noted that Plaintiff had insomnia, anxiety, and fearfulness during mental status examinations. (R. at 650, 651, 654, 657-59.)

On May 27, 2011, Dr. Gollamudi and Ms. Violand completed a Mental Impairment Questionnaire. (R. at 645-47.) They noted that Plaintiff had treated at their office since December 17, 2010 and that Plaintiff had appointments for therapy one to four times per month, and one time per month for medication management. (R. at 645.) Dr. Gollamudi and Ms. Violand identified Plaintiff's diagnosis as major depressive disorder with psychotic features, and assigned her a GAF score of 50. (*Id.*) They reported that the signs and symptoms of Plaintiff's impairments included poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, recurrent panic attacks, anhedonia, paranoia, feelings of guilt or worthlessness, difficulty concentrating, social withdrawal or isolation, a flat affect, intrusive recollections of a traumatic experience, persistent anxiety, and irritability. (*Id.*) Dr. Gollamudi and Ms. Violand determined that Plaintiff's prognosis was fair. (R. at 646.) They opined that Plaintiff's psychiatric conditions exacerbate her pain and physical symptoms. (*Id.*) They noted that Plaintiff's impairments would

13

reasonably occasion absences greater than three times per month. (R. at 647.) They also opined that Plaintiff is markedly limited in her activities of daily living, social functioning, and in her ability to maintain concentration, and pace. (*Id.*)

      3.    <u>Consulting Psychologist/Stephen Halmi, Psy.D.</u>

On July 15, 2009, Dr. Halmi evaluated Plaintiff on behalf of the state agency. (R. at 355-62.) Plaintiff drove herself to the evaluation. (R. at 355.) At the appointment, Plaintiff reported that she was able to care for personal hygiene without assistance and could read, write, handle money, do basic math, use the telephone, and prepare simple meals. Plaintiff stated that she had one friend with whom she spoke on the phone regularly, and that she sometimes attended church. (R. at 357.) Plaintiff further reported that she had lost 50 pounds in the past 60 days. (R. at 357-58.) Dr. Halmi found that Plaintiff had a flat affect, tense posture, articulate speech, was tearful, was alert and oriented, maintained adequate attention and concentration, adequate hygiene, cooperative behavior, organized and relevant thought processes, no obvious signs of anxiety or mania, full orientation, some difficulty with serial seven subtraction testing, moderate impairment in short-term memory, adequate recent and long-term memory, average abstract reasoning abilities, adequate judgment to make life decision and live independently, and no evidence of compulsions, delusions, hallucinations, obsessions, or suicidal ideation. (R. at 358-59.) Dr. Halmi found sufficient evidence to diagnose Plaintiff with an anxiety disorder not otherwise specified, and assigned Plaintiff a GAF score of 55. (R. at 359-60.)

Dr. Halmi opined that Plaintiff was moderately impaired in her ability to maintain attention to perform simple repetitive tasks, and to withstand the stress and pressure associated with day-to-day work activity. (R. at 361-62.) Dr. Halmi noted that Plaintiff was mildly impaired in her

14

ability to relate to others, and that Plaintiff had no impairment in her ability to understand and follow instructions. (*Id.*)

      4.      <u>State Agency Evaluations</u>

On August 11, 2009, Catherine Flynn, Psy.D. reviewed Plaintiff's medical records regarding her mental status. (R. at 363-80.) Dr. Flynn opined that Plaintiff had mild restrictions in her activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration. (R. at 373.) Dr. Flynn further determined that the evidence did not establish the presence of "C" criteria. (R. at 374.)

Dr. Flynn opined that Plaintiff was moderately limited in her abilities to do the following: to understand, remember and carry out short, simple instructions; to maintain attention and concentration for extended periods; to complete a normal work-day and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to accept instructions and respond appropriately to criticism from supervisors. (R. at 377-78.) Dr. Flynn also opined that Plaintiff had marked limitations in her abilities to understand and remember detailed instructions and to carry out detailed instructions. (*Id.*)

Dr. Flynn gave great weight to Dr. Halmi's conclusions, finding them consistent with the clinical findings. (R. at 379.) Dr. Flynn found Plaintiff's statements credible. (*Id.*) On October 31, 2009, state agency psychologist, Cindy Matyi, Ph.D. reviewed Plaintiff's medical record and affirmed Dr. Flynn's assessment. (R. at 477.)

## IV.    THE ADMINISTRATIVE DECISION

On November 1, 2011, the ALJ issued her decision. (R. at 7-26.) The ALJ found that Plaintiff met the insured status requirements through December 31, 2013. At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially gainful activity since her alleged onset date of December 23, 2008. (R. at 12.)

The ALJ found that Plaintiff had the following severe impairments: lumbar osteoarthritis, cervical degenerative disc disease, obesity, depression, and anxiety. (*Id.*) The ALJ noted that Plaintiff's diabetes and high blood pressure were not severe impairments. (R. at 13.) The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14.) At step four of the sequential evaluation process, the ALJ found that Plaintiff had the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the [ALJ] finds that the claimant
> has the residual functional capacity to perform light work as defined in 20 CFR

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> 404.1567(b) and 416.967(b) except that she is limited to unskilled, low stress work
> (defined as no assembly line production quotas and not fast paced).

(R. at 15.) In reaching this determination, the ALJ assigned "little weight" to the opinions of

Dr. Nwokoro, Dr. Shaw, and Dr. Kay. (R. at 21-24.) The ALJ determined that at the time Dr.

Nwokoro rendered his opinion, he was not a "treating source" because he had just begun treating

Plaintiff and his opinion is unsupported by objective signs and findings. (R. at 21-22.) Likewise,

the ALJ determined that Dr. Shaw offered his opinion after examining Plaintiff only one time. (R.

at 22.) The ALJ further noted that the above RFC "adequately accounts" for Dr. Shaw's later

examination findings. (*Id.*) Turning to Dr. Kay, the ALJ found objective tests and findings do not

support Dr. Kay's opinion. (R. at 23.) The ALJ assigned "some weight" to the opinions of the state

agency reviewing physicians, Drs. Klyop and Bolz, noting that both doctors limited Plaintiff to

light work, but the ALJ found that the additional restrictions articulated by Drs. Klyop and Bolz

are not supported by objective signs and findings in the record. (R. at 21.)

In regards to Plaintiff's mental impairments, the ALJ assigned "little weight" to the

opinion of Dr. Gollamudi. (R. at 24.) The ALJ found Dr. Gollamundi's assessment "inconsistent

with the reported GAF scores of 50 to 51, as well as the claimant's reported daily activities and

mental status examinations, which were generally normal." (R. at 24.) The ALJ also assigned

"little weight" to Dr. Nwokoro's opinions regarding Plaintiff's mental health. The ALJ noted that

Dr. Nwokoro "is an internist and is unqualified to offer an opinion on the claimant's level of

mental functioning." (*Id.*) The ALJ adopted the findings of Drs. Halmi, Flynn and Matyi. (R. at

23-24.)

17

The ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. (R. at 16.)

Relying on the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the state and national economy that Plaintiff can perform. (R. at 25.) The ALJ therefore concluded that Plaintiff is not disabled under the Social Security Act. (R. at 26.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally,

18

even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [social security administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.     LEGAL ANALYSIS

In her Statement of Errors, Plaintiff asserts the following: (1) the ALJ failed to properly weigh the opinions provided by Plaintiff's treating sources, Drs. Nwokoro, Shaw, Kay, and Gollamudi; (2) the ALJ improperly allowed her own lay assessment of medical data and unsupported speculation to stand in the place of competent expert opinion evidence; (3) the ALJ's credibility finding is neither adequately articulated nor supported by the evidence of record; and (4) and the ALJ's conclusions regarding Plaintiff's daily activity levels are unsupported by the record. (ECF No. 15 at 10.) The Undersigned will address each of Plaintiff's arguments in turn.

### A.     Treating Source Opinions

Plaintiff contends that the ALJ erred by rejecting "the opinions of four of Plaintiff's treating sources: Drs. Nwokoro, Shaw, Kay, and Gollamudi." (ECF No. 15 at 12.) The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. *See* 20 C.F.R. § 416.927(d). The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a

19

patient's] medical impairment(s) and may bring a unique prospective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [a]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. Apr. 28, 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "[t]he requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician

20

rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, No. 09-6081, 2010 WL 3521928, at *6 (6th Cir. Aug. 31, 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(d)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

1.  Weight Assigned to Dr. Nwokoro

In the instant action, Dr. Nwokoro provided an opinion regarding Plaintiff's physical impairments on February 18, 2009, and Dr. Nwokoro completed a questionnaire regarding Plaintiff's mental impairments on May 22, 2009.

a.  *Opinion Regarding Physical Impairments*

The ALJ found that at the time Dr. Nwokoro gave his medical opinion regarding Plaintiff's physical impairments, Dr. Nkworo had just begun treating Plaintiff and was therefore not a treating source. (R. at 21.) The ALJ therefore gave "little weight" to Dr. Nwokoro's opinion. (*Id.*)

21

Plaintiff asserts that the ALJ's "principal error [was] failing to even recognize [Dr. Nwokoro] as a treating source." (ECF No. 15 at 12.) Plaintiff argues that, "[t]he fact that Dr. Nwokoro had 'just begun' his treatment relationship with Plaintiff is plainly insufficient to negate his treating source status." (ECF No. 15 at 13.) Plaintiff contends further that the ALJ's "failure to apply a treating source analysis to Dr. Nwokoro's opinion merits reversal in that it represents a plain departure from the opinion weighing regulations and a clear failure to provide the 'good reasons' required to justify any rejection of treating source opinion evidence." (ECF No. 15 at 13.)

As set forth above, to qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502. A physician is a treating source if he or she "has had an ongoing treatment relationship with the claimant . . . 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation [that is] typical for the [treated condition(s)].' 20 C.F.R. § 404.1502." *Blakley*, 581 F.3d at 407. A Court must determine whether or not an ongoing treatment relationship exists at the time the physician's opinion is rendered. *Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 167 F. App'x 496, 506 (6th Cir. 2006) ("[T]he relevant inquiry is . . . whether [claimant] had the ongoing relationship with [the physician] *at the time he rendered his opinion*. [V]isits to [the physician] *after* his RFC assessment could not retroactively render him a treating physician at the time of the assessment."); *see also Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) ("These two examinations did not give [the physician] a long term overview of [the claimaint's] condition.").

Dr. Nwokoro provided an opinion after examining Plaintiff only one time. One examination is not sufficient to establish an ongoing treatment realationship. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) ("the rationale of the treating physician doctrine simply does not apply" where a physician issues an opinion after a single examination).The Undersigned therefore

finds that the ALJ offered a legally sufficient reason for finding that Dr. Nwokoro was not a treating source.

Although the ALJ properly rejected Dr. Nwokoro's opinion as a treating source opinion, the opinion is still a medical opinion. An ALJ must "consider all of the following factors in deciding the weight [to] give to any medical opinion:" the examining relationship, the treatment relationship, the supportability of the opinion, the consistency of the opinion, and any specialization. 20 C.F.R. § 404.1527(c).

The Undersigned finds that substantial evidence supports the ALJ's stated reasons for affording little weight to Dr. Nworkoro's opinions. The ALJ made the following findings regarding Plaintiff's treatment with Dr. Nworoko:

> Progress notes dated through October 2009, musculoskeletal examinations showed no evidence of cyanosis, clubbing, edema, or other abnormalities, and neurological examinations showed no specific abnormalities. Moreover, on February 25, 2009, the claimant stated that she was compliant with her medications and was doing "okay," and on April 8, 2009, the claimant said she had been exercising and also walking "a lot."

(R. at 17.) The ALJ further noted that, "Dr. Nwokoro's treatment notes showed no musculoskeletal or neurological abnormalities." (R. at 21.) The Undersigned finds that the ALJ's statements above establish that the ALJ properly evaluated Dr. Nwokoro's opinion as a medical opinion.

Finally, the ALJ did not err in rejecting Dr. Nworoko's opinion that Plaintiff is unable to do sustained work given that this determination is reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(1) ("[The Commissioner] is responsible for making the determination or decision about whether [the claimant] meets the statutory definition of disability . . . ."); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir.2007) (holding that the ALJ properly rejected a treating physician's opinion that the claimant was disabled because such a determination was reserved to the

23

Commissioner).

      b.   *Opinion Regarding Mental Impairments*

The ALJ gave little weight to Dr. Nwokoro's mental-health findings, concluding that Dr. Nowkoro "is an internist and is unqualified to offer an opinion on claimant's level of mental functioning." (R. at 24.) Plaintiff argues that the ALJ improperly rejected Dr. Nwokoro's opinion because he is an internist. Plaintiff's argument is not well taken. "[P]hysicians, with the exception of those specializing in psychiatry . . . are totally unqualified to diagnose psychological disorders." *Lingo v. Sec'y of Health & Human Servs.*, 658 F. Supp. 345, 351 (N.D. Ohio 1986). Moreover, substantial evidence supports the ALJ's reason to assign little weight to Dr. Nwokor's mental health opinion. The ALJ cited significant evidence throughout her opinion that contradicts Dr. Nwokoro's opinion. For example, the ALJ noted that Dr. McClean found "only a moderately depressed and anxious mood . . . ." (R. at 19.) The ALJ also noted that Dr. Gollamundi reported "euthymic mood." (R. at 20.). The ALJ explained that Dr. Halmi found that Plaintiff was "only mildly impaired in the ability to relate to others, and he found no impairments in the ability to understand and follow instructions." (R. at 23.) The ALJ further reported that state agency psychologist Dr. Flynn opined that Plaintiff "was capable of maintaining attention and concentration for—and performing—simple, routine, one-to two-step tasks." (R. at 23.)

For the reasons discussed above, the Undersigned finds that the ALJ properly rejected Dr. Nwokoro's opinions regarding Plaintiff's physical and mental limitations.

      2.   <u>Weight Assigned to Dr. Shaw</u>

The ALJ found that Dr. Shaw was not a treating source, and gave "little weight" to Dr. Shaw's opinion. (R. at 22.) Plaintiff asserts that the ALJ "decline[d] to acknowledge Dr. Shaw's opinions as treating source opinions because, like Dr. Nwokoro, he had just begun treating and

examining Plaintiff at the time his assessment was drafted." (ECF No. 15 at 14.) Plaintiff's argument is not well taken. As discussed above, an ongoing treatment relationship is required to trigger treating physician analysis. Dr. Shaw had not established an ongoing treatment relationship at the time he assessed Plaintiff. Dr. Shaw only examined Plaintiff one time. Therefore, for the reasons outlined above, the ALJ properly declined to apply the treating-physician analysis.

Plaintiff nevertheless argues that the ALJ's "assignment of 'little weight' to Dr. Shaw's opinions is still unsupported and not adequately explained." (ECF No. 15 at 14.) Plaintiff contends that the ALJ improperly asserted that Dr. Shaw consistently found normal "musculoskeletal and neurological examinations." (ECF No. 15 at 14.) Plaintiff notes that the ALJ even noted that Dr. Shaw recorded clinical abnormalities. (ECF No. 15 at 14.) Plaintiff argues that, "Dr. Shaw's opinion represents further consistent and supported evidence of Plaintiff's disability which was not properly rejected by [the] ALJ." (ECF No. 15 at 14.)

The Undersigned disagrees and finds that the ALJ provided adequate reasoning for rejecting Dr. Shaw's opinion. The ALJ stated that treatment notes from Dr. Shaw "dated between December 2009 and May 2011 generally show no more than decreased cervical and lumbar range of motion and some tenderness." (R. at 16.) The ALJ also noted that, "the cervical and lumbar spine imaging in the record shows only some lumbar and cervical degenerative changes but with no neural involvement." (R. at 22.) These statements establish that the ALJ properly evaluated Dr. Shaw's opinion pursuant to 20 C.F.R. § 404.1527(c). The Undersigned finds that substantial evidence supports the ALJ's finding. Therefore, Plaintiff's argument regarding Dr. Shaw's opinion lacks merit.

3.    Weight Assigned to Dr. Kay

The ALJ acknowledged Dr. Kay as a treating physician, but gave "little weight" to Dr.

Kay's opinion. (R. at 23.) The ALJ found that Dr. Kay's opinion was unsupported by objective

signs and findings. (R. at 23.) Plaintiff asserts that while the ALJ "remarks that Dr. Kay's

conclusions are 'unsupported by objective signs and findings' she almost immediately undermines

her own position by acknowledging the presence of such signs and findings in the record." (ECF

No. 15 at 15.) Plaintiff notes that Dr. Kay found "lumbar and cervical tenderness and reduced

range of motion." (ECF No. 15 at 15.) Plaintiff contends that, "the record plainly contains imaging

and other testing reviewed by Dr. Kay establishing legitimate, objectively verifiable spinal

pathologies." (ECF No. 21 at 3.) The Undersigned disagrees.

The Undersigned finds that the ALJ properly weighed Dr. Kay's opinion and provided

"good reasons" for rejecting the opinion. First, the ALJ acknowledged that Dr. Kay found some

abnormalities, but "only decreased range of motion of the lumbar spine and tenderness." (R. at 18.)

The ALJ also found Dr. Kay's assessment "inconsistent with his own notes." (R. at 23.) The ALJ

stated the following regarding Dr. Kay's treatment notes:

> Dr. Kay noted only "minor" spondylosis, recommended only exercise, and advised
> the claimant to look for light duty work. Subsequent treatment notes dated through
> December 2010 primarily document the claimant's subjective complaints and
> contain no significant musculoskeletal abnormalities. On August 11, 2010, Dr. Kay
> stated that the claimant was doing well on pain management, and on September 13,
> 2010, the claimant said that her medication helped her back and knee pain.

(R. at 17.) The ALJ further noted that, Dr. Kay "stated that the claimant's MRI reports were

'basically normal' and that the claimant's pain level was 'quite adequate' with treatment." (R. at

17.) The ALJ also asserted that Dr. Kay reported, "medication controlled the claimant's back and

leg pain symptoms." (R. at 17.) These are rational grounds to discount a treating physician's

opinion and provide the requisite good reason for doing so. *See Helm v. Comm'r of Soc. Sec.*, 405

F. App'x 997, 1001 (6th Cir. 2011) (concluding that the ALJ met the "good reasons" requirement

for a variety of reasons, including by noting that the treating physician's findings were "unsupported by objective medical findings and inconsistent with the record as a whole."); *see also* 20 C.F.R. § 404.1527(d)(3) (identifying "consistency" with the record as a whole as a relevant consideration). Therefore, the Undersigned finds that Plaintiff's argument regarding Dr. Kay's opinion lacks merit.

4.    Weight Assigned to Dr. Gollamundi

The ALJ gave "little weight" to Dr. Gollamundi's opinion. (R. at 24.) The ALJ found Dr. Gollamundi's opinion inconsistent and not supported by the medical record. (R. at 24.) First, the ALJ found Dr. Gallumandi's opinion inconsistent with reported GAF scores of 50 to 51. (R. at 24.) Plaintiff contends the ALJ improperly used reports of Plaintiff's GAF scores of 50 to 51. (ECF No. 15 at 17.). Plaintiff asserts that a GAF score of 50 indicates "serious symptoms/impairments." (*Id.*)

The Undersigned finds that the ALJ did not err in considering Plaintiff's GAF scores. The ALJ conceded that some of the GAF scores are below 50, but found that, "the consistency of the higher GAF scores in the record and the preponderance of the examination findings from the claimant's treating and examining sources supports a reasonable inference that the claimant experiences only moderate difficulties in functioning." (R. at 20.) Moreover, the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy v. Astrue,* 247 F. App'x 761, 766 (6th Cir. 2007) (citations omitted). Therefore, any decision not to rely on the GAF score is of little consequence and would not undermine a decision supported by substantial evidence. *See Oliver v. Comm'r of Soc. Sec.,* No. 09–2543, 2011 WL 924688, at *4 (6th Cir. Mar.17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial

27

evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Soc. Sec. Admin.,* 110 F. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

Plaintiff also asserts that the ALJ's reasons "for discounting the weight due Dr. Gollamudi's assessment are not reasonably supported by the case record." (ECF No. 15 at 17.) Plaintiffs assertion is not well taken. The ALJ cites substantial contradicting evidence to support her opinion. For example, the ALJ noted that Dr. Halmi reported:

> adequate hygiene, cooperative behavior, normal speech, organized and relevant thought process, no obvious signs of anxiety or mania, full orientation, adequate attention and concentration, only some difficulty with serial seven subtraction testing, only moderate impairment in short-term memory, adequate recent and long term memory, average abstract reasoning abilities, adequate judgment to make life decisions and live independently, and no evidence of compulsions, delusions, hallucinations, obsessions, or suicidal thoughts.

(R. at 18.) The ALJ also noted that Mr. Tieman "indicated that mental status examination showed a euthymic mood, goal-directed thought process, improved sleep, and no evidence of delusions, hallucinations, or suicidal ideation." (R. at 19.)

"[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight . . . [but] 'is just one more piece of evidence for the administrative law judge to weigh.'" *McMurphy v. Comm'r of Soc. Sec.*, No. 13-10600, 2014 WL 917046, at *16 (E.D. Mich. Mar. 10, 2014) (quoting *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir. 2008). In the instant action, the ALJ provided adequate contradictory evidence reject Dr. Gollamundi's opinion. The Undersigned therefore finds that the ALJ provided legally sufficient reasons to reject Dr. Gollumundi's opinion.

In sum, substantial evidence supports the ALJ's decision to give little weight to the opinions of Drs. Nworoko, Shaw, Kay, and Gollamundi. The Undersigned finds that the ALJ

properly addressed and rejected each doctor's opinion. The ALJ cited "good reasons" for assigning little weight to these opinions. Thus, Plaintiff's first assignment of error lacks merit.

**B.     Medical Determinations Outside the Scope of an ALJ's Duties**

Plaintiff asserts that the ALJ made determinations that are reserved for medical experts within the Commission. Plaintiff contends, that, "[w]hile [the ALJ] characterizes these findings as non-supportive of Dr. Kay's opinion and otherwise 'adequately accounted for' by her own RFC finding, it is again important to note that [the ALJ] lacks the expertise to supplant Dr. Kay's medical analysis of this clinical data." (ECF No. 15 at 15.) Plaintiff also argues that it was unreasonable for the ALJ "to conclude that Plaintiff's allegations of disabling symptoms are inconsistent with the findings of her physicians when those physicians have universally opined that Plaintiff's work capacity rests below that required for fulltime, competitive employment." (ECF No. 15 at 19.)

The Undersigned rejects Plaintiff's underlying proposition that the ALJ reviewed the findings "from a medical perspective." A review of the ALJ's decision makes abundantly clear that in making her RFC determination, she weighed and considered the evidence as a whole, including the opinion evidence, the objective evidence, and Plaintiff's credibility.

It is well settled that "ALJ's must not succumb to the temptation to play doctor and make their own independent medical findings." *Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996)). An ALJ, however, reserves the right to decide certain issues, such as a claimant's RFC. 20 C.F.R. § 404.1527(d). Nevertheless, in assessing a claimant's RFC, an ALJ must consider all relevant record evidence, including medical source opinions on the severity of a claimant's impairments. *See* 20 C.F.R. §§ 404.1527(d), 404.1545(a); *see also* Social Security Ruling 96–5p ("some issues are not medical

issues regarding the nature and severity of an individual's impairment(s) but are administrative

findings that are dispositive of a case; *i.e.*, . . .   [w]hat an individual's RFC is").

       In this case, the ALJ did not assume the role of doctor, nor did she provide her own

independent medical evaluation. In rendering her opinion, the ALJ gave the opinions of state

agency physicians some weight. The ALJ also gave Dr. Halmi's opinion weight. The ALJ did not

err by making medical determinations outside the record. This assignment of error is without

merit.

## C.       Challenges to the ALJ's Credibility Finding

       Plaintiff contends that the ALJ improperly found her testimony not credible. (ECF No. 15

at 18.) The Sixth Circuit has provided the following guidance in considering an ALJ's credibility

assessment:

> Where the symptoms and not the underlying condition form the basis of the
> disability claim, a two-part analysis is used in evaluating complaints of disabling
> pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001);
> *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask
> whether the there is an underlying medically determinable physical impairment that
> could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. §
> 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must
> evaluate the intensity, persistence, and limiting effects of the symptoms on the
> individual's ability to do basic work activities. *Id.*

*Rogers*, 486 F.3d at 247.

       "The ALJ's assessment of credibility is entitled to great weight and deference, since he [or

she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x

469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.

1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to

disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve

conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference

30

extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted). An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996); *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted).

The Sixth Circuit has also held that "even if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the

ALJ's decision will be upheld as long as substantial evidence remains to support it." *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)).

The Undersigned finds that substantial evidence supports the ALJ's credibility finding. For example, in finding the Plaintiff not credible, the ALJ noted that:

> claimant's assertion that she has not been able to work at any time since the alleged disability onset date is not supported by objective medical testing. For example, the claimant has alleged symptoms more severe than the pathology shown on cervical and lumbar spine studies in the record. An MRI of the cervical spine on June 3, 2008 showed multilevel disc bulging with only some mild posterior longitudinal ligament thickening and only some straightening of the cervical lordosis. Further, the report showed only a slight effacement at C4-5 and C5-6 with no evidence of definite cord compression. An MRI of the lumbar spine on April 14, 2011, showed faced arthritis at level L3-4, L4-5, and L5-S1. However, posterior disc margins were clear throughout the lumbar spine, and the report showed no evidence of central canal or foraminal stenosis.

(R. at 16) (internal citations omitted.) The ALJ also noted the following contradictions in the medical reports:

> claimant's credibility is further reduced by inconsistent statements in the record. When consultative psychologist Dr. Halmi evaluated the claimant on July 15, 2009, the claimant said that she completed the 11th grade, but she testified at the hearing that she completed only the 9th grade. The claimant also told Dr. Halmi on July 15, 2009, that she currently weighed 198 pounds and had lost 50 pounds in the last 60 days. However, approximately two months earlier, on May 20, 2009, Dr. Nwokoro reported the same weight of 198 pounds.

(R. at 20) (internal citations omitted.) Finally, the ALJ reported on Plaintiff's daily activities in making her credibility finding. The ALJ asserted that Plaintiff "told Dr. Nwokoro on April 8, 2009 that she had been exercising and was also walking 'a lot.'" (R. at 20.)

The Undersigned concludes that the ALJ's credibility finding regarding the severity and disabling effect of Plaintiff's conditions and symptoms was entitled to deference and supported by substantial evidence. Accordingly, Plaintiff's third contention of error lacks merit.

**D.      ALJ's Conclusions Regarding Daily Activity**

The ALJ found that "[t]he claimant's description of daily activities is inconsistent with her complaints of disabling symptoms and limitations." (R. at 20.) Plaintiff faults the manner in which the ALJ describes her daily activities, and accuses the ALJ of overstating how well Plaintiff performs them. (ECF No 15 at 17.) Substantial evidence, however, supports the ALJ's conclusions regarding Plaintiff's social and daily activities. The ALJ noted that the Plaintiff reported "that she lived in an apartment with her two daughters. She said that she had difficulty sleeping at night, due to pain, and that she usually stayed in bed for most of the day." (R. at 16.) The ALJ also noted that Plaintiff reported that, "she was able to manage her financed and attended church on a weekly basis." (*Id.*)

Even if there were evidence in the record to support Plaintiff's speculation that she had greater limitations in her activities of daily living, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quotation marks and citation omitted). In other words, even if there were evidence to support Plaintiff's position, the ALJ's determination regarding Plaintiff's activities of daily living is supported by substantial evidence. Therefore, Plaintiff's fourth assignment of error lacks merit.

**VII.      CONCLUSION**

In conclusion, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.        PROCEDURE ON OBJECTIONS

If Plaintiff seeks review by the District Judge of this Report and Recommendation, she may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

Plaintiff is specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (internal citation omitted)).

Date:   April 30, 2015                                  /s/ *Elizabeth P. Deavers*
                                                                 Elizabeth A. Preston Deavers
                                                                 United States Magistrate Judge